Abram COLEMAN, Rhonda Coleman, and Jerry Wayne Coleman, Appellants,

v.

Cynthia Ann COLEMAN, Appellee.

No. 63A01–1009–PL–500.

Court of Appeals of Indiana.

May 31, 2011.

Boyd A. Toler, Toler Law Office, Petersburg, IN, Attorney for Appellant.

Scott A. Funkhouser, Evansville, IN, Attorney for Appellee.

## OPINION

BARNES, Judge.

### Case Summary

Abram Coleman, Rhonda Coleman, and Jerry Wayne Coleman (collectively "the Colemans") appeal a judgment after jury trial in favor of Cynthia Coleman awarding her $20,000 in damages and $11,097 in attorney fees. We reverse and remand.

### Issues

The restated issues before us are:

I. whether there is sufficient evidence in the record to support a judgment against the Colemans for unjust enrichment; and

II. whether the jury erred in awarding attorney fees to Cynthia.

### Facts[1]

Jerry Wayne and Abram are the sons of Jerry Coleman.[2] Rhonda is married to Jerry Wayne. Cynthia was Jerry's fifth wife. Jerry and Cynthia were married from 1989 to 2006, when Jerry died. Cynthia is Jerry Wayne and Abram's stepmother.

In July 1984, Dale and Theresa Hornby deeded to Jerry Wayne a parcel of property located in Petersburg at 915 W. County Road 50 S. ("the 915 property"). There is conflicting evidence in the record as to how the 915 property was purchased. On the one hand, there was testimony that it was obtained in exchange for a 1969 Camaro that Jerry Wayne owned. On the other hand, a bank loan officer recalled that Jerry and Jerry Wayne both executed a loan to purchase the property and that it was Jerry who actually made payments on the loan. Tax bills for the property were sent to Jerry Wayne, but apparently Jerry paid those bills. The property always remained in Jerry Wayne's name only.

After the 915 property was obtained, Jerry and Jerry Wayne built a residence on it. Jerry Wayne asserts that he paid

---

1. Ordinarily, we would state the facts in a light most favorable to the verdicts. Given the split nature of the jury's decision, however, it is difficult to discern which of the highly conflicting evidence it credited and which it rejected.

2. We will refer to the son as Jerry Wayne and the father as Jerry throughout this opinion.

for the materials to build the home. At some point, Jerry married his fourth wife, Sharon, and they lived together at the 915 property. Jerry Wayne did not charge any rent to Jerry or Sharon. Jerry and Sharon divorced sometime in the 1980s. There is no evidence that the 915 property was included as part of the marital estate in that divorce.

Jerry married Cynthia in 1989, and they lived together at the 915 property. Again, Jerry Wayne charged no rent. It was Cynthia's belief that Jerry actually owned the 915 property and that Jerry, for reasons that are not clear in the record, simply had an aversion to titling properties in his name. Cynthia and Jerry, using their own funds, made a number of improvements on the 915 property while they lived there.

Jerry Wayne for the most part did not live at the 915 property. In 1993, Jerry Wayne purchased from his uncle a parcel of land near the 915 property, located in Petersburg at 943 W. County Road 50 S. ("the 943 property"), and constructed a house on it.

In 2001, Jerry Wayne was having financial difficulties and was facing foreclosure on the 943 property. At the same time, Jerry's sister, Joyce Buckley, was facing foreclosure on a residence she owned that was located in Petersburg at 962 W. County Road 125 S. ("the 962 property"). At this time, Cynthia's nephew, Shane Myles, offered to purchase the 915 property, and Jerry Wayne agreed to the sale.

There is much contradictory evidence surrounding the sale of the 915 property and purchase of the 962 property. The settlement statement for the 915 property sale lists Jerry Wayne only as the seller. Some of the sale proceeds were used to pay off an existing loan on the 915 property. Several thousand dollars went toward what is listed on the statement as a federal tax lien; Jerry Wayne insists that the statement is erroneous and that this was actually a student loan of his, while Cynthia insists that Jerry paid off the student loan *before* closing. Approximately $29,000 of the proceeds of the 915 sale were used to pay off Joyce's loan on the 962 property. Finally, Jerry Wayne received nearly $11,000 of the remaining funds from the sale of the 915 property. Jerry Wayne asserts that he agreed to pay this $11,000 directly to Joyce at Jerry's request in order to alleviate her financial troubles. Cynthia asserts that Jerry had to promise Jerry Wayne that he would receive $10,000 after closing in order to get him to agree to the sale of the 915 property, but that Jerry Wayne immediately signed over the closing check to Jerry.

The 2001 deed for the 915 property lists Jerry Wayne as the sole grantor. Because of the sale of the 915 property, Jerry and Cynthia moved into the 962 property. Jerry Wayne states that he did not want his name on the deed for the 962 property because of the possibility that it could be attached in connection with the foreclosure proceedings on the 943 property. In any event, it is undisputed that Jerry called Abram and asked if he would be willing to have his name placed on the deed for the 962 property, and Abram agreed. Jerry Wayne claims Jerry called Abram at Jerry Wayne's insistence. Abram was the sole grantee on the 2001 deed for the 962 property. Cynthia had no discussions with Abram before his name was placed on the 962 property deed, but Jerry had told her that Abram would never kick her out of the house.

After moving into the 962 property, Jerry and Cynthia used their own funds to make a number of improvements to the property. None of these improvements were discussed with Jerry Wayne or

Abram beforehand. As with the 915 property, Jerry and Cynthia paid no rent to live there, although Jerry did pay the property taxes. Also as with the 915 property, Cynthia believed that the 962 property actually belonged to her and Jerry, despite the lack of any documentary evidence to that effect.

Jerry died in September 2006. Shortly after his death, Abram told Cynthia that the 962 property was hers. However, within a few weeks after Jerry's death, Jerry Wayne and Abram told Cynthia that she needed to make preparations to move elsewhere. Cynthia did move out of the 962 property in November 2006 and moved in with her parents. After doing so, she began removing fixtures, such as cabinets, from the 962 property. In early 2007, Jerry Wayne and Abram filed a notice to evict Cynthia from the premises. A sheriff's deputy was present when Cynthia subsequently removed her remaining belongings from the 962 property. Additionally, Abram deeded the 962 property to Rhonda sometime during 2007.

On November 7, 2007, Cynthia filed a multi-count complaint against the Colemans. Count I was an ejectment and quiet title action with respect to the 962 property; Count II sought replevin with respect to some personal property at the 962 property that she claims was not returned to her; Count III alleged the Colemans were unjustly enriched by taking the 962 property and related personal property; Count IV alleged promissory estoppel, i.e. that Cynthia was entitled to remain at the 962 property because of promises made by the Colemans; Count V alleged theft of both the 962 property and related personal property, and sought treble damages and attorney fees; Count VI alleged conversion; and Count VII alleged fraud.

The independent fraud count was dismissed before trial.[3] A jury trial commenced on July 7, 2010. During trial, Cynthia presented appraisal evidence valuing the 962 property at between $40,000 and $65,000. She also sought up to $125,000 with respect to improvements made to the 962 property.[4] Ultimately, the jury found in Cynthia's favor on the unjust enrichment count and awarded her $20,000 in damages. It also found in Cynthia's favor on the replevin count with respect to a stove and an antique picture. It found in favor of the Colemans on the promissory estoppel and conversion counts. With respect to the theft count, the jury originally returned a verdict finding in favor of the Colemans, but awarding Cynthia attorney fees in the amount of $14,465.73. The jury foreperson informed the trial court that the jury did not believe the Colemans had committed theft. The trial court then asked the jury to re-read its instructions and return a different verdict for theft, stating that the verdict was defective. After re-deliberating, the jury returned a verdict in favor of Cynthia on the theft count, but awarded her no damages, and again awarded her attorney fees. The trial court subsequently reduced the amount of the fees to $11,097.

The ejectment and quiet title claim was argued to the jury during opening arguments; the Colemans also moved for a directed verdict on that claim after Cynthia presented her evidence, which the trial court denied. However, for reasons that are not clear, that claim was not submitted to the jury for consideration.

---

3. The ejectment and quiet title count of the complaint also stated claims for fraud and/or constructive fraud.

4. It is not entirely clear, but this alleged $125,000 figure also seems to have included alleged upkeep related to the 915 property, not the 962 property.

The Colemans assert that after trial, the trial court judge stated in chambers that he was going to enter judgment in their favor on that claim; Cynthia does not dispute this assertion. However, no judgment on the ejectment and quiet title claim has ever been entered on the record.

The trial court entered judgment on the jury verdicts. The Colemans filed a motion to correct error, which the trial court denied. They now appeal.[5]

### Analysis

■ Before addressing the merits of this appeal, we pause to note that this is not an appeal from a final judgment, although the Colemans asserted that it was in their notice of appeal. There has not as yet been a disposition of Cynthia's ejectment/quiet title claim. Thus, there has not been a disposition of all issues as to all parties, which is the definition of a final judgment. *Georgos v. Jackson,* 790 N.E.2d 448, 451 (Ind.2003) (citing Ind. Appellate Rule 2(H)). Additionally, the trial court did not certify its partial judgment as final under Indiana Trial Rule 54(B). Ordinarily, appellate courts lack subject matter jurisdiction to entertain appeals from non-final rulings. *See id.*

■ However, Indiana Appellate Rule 14(A)(1) permits interlocutory appeals as of right from any order for the payment of money. Here, the trial court's judgment on the jury verdicts imposed monetary damages and attorney fees against the Colemans. It is true that there is an opinion from this court differentiating an "order" for the payment of money from a partial judgment awarding damages, and indicating that a partial judgment awarding damages was not an interlocutory order appealable as of right. *See National Gen. Ins. Co. v. Riddell,* 705 N.E.2d 465, 465 n. 1 (Ind.Ct.App.1998). Ultimately, however, that statement was dicta, because we elected to consider the appeal anyway under prior Indiana Appellate Rule 4(E).

■ Moreover, the reason for the rule permitting certain interlocutory orders to be appealable as of right is that some orders, such as those for the payment of money, " 'carry financial and legal consequences akin to those more typically found in final judgments....' " *Whitezel v. Burosh,* 822 N.E.2d 1088, 1090 (Ind.Ct.App. 2005) (quoting *State v. Hogan,* 582 N.E.2d 824, 825 (Ind.1991)). It is unclear why the financial and legal consequences of a partial judgment awarding damages would be any less than an interlocutory order for the payment of money. Thus, notwithstanding the footnote in *Riddell,* we conclude that the Colemans are entitled to appeal the interlocutory partial judgment against them as of right.[6]

### I. Unjust Enrichment

The Colemans make two arguments with respect to the unjust enrichment judgment. They contend that the jury was erroneously instructed on the elements of an unjust enrichment claim and that, in any event, there was insufficient evidence

---

**5.** The Colemans do not challenge the replevin judgment.

**6.** It clearly would have been preferable in addressing the issues before us if there were an existing judgment, one way or the other, on the ejectment/quiet title claim. The central claim in this case seems to boil down to who "actually" owns the 962 property, the Colemans or Cynthia. Moreover, to the extent there is a suggestion in the record that the claim was removed from the jury's consideration because it sought equitable relief, there is longstanding precedent to the effect that a quiet title action, though bearing some similarities to equitable actions, nonetheless is triable by jury. *See Puterbaugh v. Puterbaugh,* 131 Ind. 288, 297–98, 30 N.E. 519, 522 (1892).

to support a judgment on that claim. We conclude that regardless of how the jury might have been instructed, there is insufficient evidence to support a judgment against the Colemans for unjust enrichment, and thus we limit our analysis to that argument.

When reviewing a claim of insufficient evidence in a civil case, we will affirm a verdict if, considering the probative evidence and reasonable inferences, a reasonable jury could have arrived at the same determination. *TRW Vehicle Safety Sys., Inc. v. Moore*, 936 N.E.2d 201, 208 (Ind. 2010). We will neither reweigh the evidence nor judge witness credibility, but must consider only the evidence and inferences most favorable to the judgment. *Id.* We will reverse a verdict in favor of a plaintiff only if there is a lack of evidence, or evidence from which a reasonable inference can be drawn, on an essential element of the plaintiff's claim. *Id.*

In Indiana, unjust enrichment is a label given to so-called "constructive contracts," which are not actually contracts at all; such "contracts" are also called quantum meruit, contracts implied-in-law, or quasi contracts. *Zoeller v. E. Chicago Second Century, Inc.*, 904 N.E.2d 213, 220–21 (Ind.2009). The parties vigorously dispute what the elements of unjust enrichment are; specifically, whether it requires evidence that a defendant impliedly or expressly requested the benefit provided by a plaintiff. Our supreme court's only extended pronouncement on the subject of unjust enrichment in recent decades came in *Bayh v. Sonnenburg*, 573 N.E.2d 398 (Ind.1991), *cert. denied.* *Bayh* concerned a class action suit by State hospital mental patients to collect wages they alleged they were due for work they were asked to perform while institutionalized. In defining unjust enrichment, our supreme court described it as " 'a legal fiction invented by

the common-law courts in order to permit a recovery ... where, in fact, there is no contract, but where the circumstances are such that under the law of natural and immutable justice there should be a recovery as though there had been a promise.' " *Bayh*, 573 N.E.2d at 408 (quoting *Clark v. Peoples Sav. & Loan Ass'n*, 221 Ind. 168, 171, 46 N.E.2d 681, 682 (1943)).

The court concluded, "To prevail on a claim of unjust enrichment, a plaintiff must establish that a measurable benefit has been conferred on the defendant under such circumstances that the defendant's retention of the benefit without payment would be unjust. One who labors without an expectation of payment cannot recover in quasi-contract." *Id.* (citing *Biggerstaff v. Vanderburgh Humane Soc.*, 453 N.E.2d 363, 364 (Ind.Ct.App.1983)). Ultimately, the court held the mental patients were not entitled to recover under unjust enrichment because they had no expectation of being paid for their work.

▪▪▪ Standing next to *Bayh* are approximately twenty cases from this court, decided over the last forty years, that define a claim of unjust enrichment using variations on the following language:

> To prevail on a claim of unjust enrichment, a plaintiff must establish that it conferred a measurable benefit on the defendant under circumstances in which the defendant's retention of the benefit without payment would be unjust. *Wright v. Pennamped*, 657 N.E.2d 1223, 1229 (Ind.Ct.App.1995). Recovery under this theory only requires the plaintiff to establish that the defendant impliedly or expressly requested the benefits be conferred. *Id.* at 1330. However, a party who has not expressly or impliedly requested the benefit is under no obligation to pay for the benefit. *Olsson v. Moore*, 590 N.E.2d 160, 163 (Ind.Ct.App. 1992).

*Garage Doors of Indianapolis, Inc. v. Morton,* 682 N.E.2d 1296, 1303 (Ind.Ct. App.1997), *trans. denied; see also Kody Eng'g Co., Inc. v. Fox & Fox Ins. Agency, Inc.,* 158 Ind.App. 498, 505, 303 N.E.2d 307, 310 (1973). Thus, these cases add an element to the definition of unjust enrichment that was not expressly mentioned in *Bayh:* that in order to recover, the plaintiff must prove that the defendant expressly or impliedly requested the benefits that he or she received from the plaintiff. We most recently stated this requirement in *Ritzert Co., Inc. v. United Fidelity Bank, FSB,* 935 N.E.2d 756, 760 (Ind.Ct.App. 2010), *trans. denied.*

In fact, this general requirement was mentioned in the *Biggerstaff* case that the *Bayh* court cited for its definition of unjust enrichment. There, however, we stated, "To recover under the theory of implied contract or quantum meruit, the plaintiff is *usually* required to establish that the defendant impliedly or expressly requested the benefits conferred." *Biggerstaff,* 453 N.E.2d at 364 (emphasis added) (footnote omitted). We also noted that "relief will be denied if the plaintiff did not contemplate a fee in consideration of the benefit or if the defendant could not reasonably believe the plaintiff expected a fee." *Id.* We observed that taken together, "these two rules preclude recovery where the benefit is officiously or gratuitously conferred." *Id.*

■ A benefit would be gratuitously conferred if either the plaintiff did not expect payment or the defendant reasonably did not expect to have to pay for the benefit conferred. As for "officiousness," it "is a term traditionally used to describe interference in the affairs of others that is not justified under the circumstances." *Id.* If, however, a plaintiff conferred benefits to a defendant under circumstances where the action was necessary for the protection of interests of the defendant or a third person, restitution will not be denied in the absence of a request by the defendant that the benefits be provided. *Id.* In *Biggerstaff,* the defendant owned dogs in very poor health that were seized by law enforcement and taken into custody by the plaintiff, the local Humane Society, and nursed back to health. Despite the lack of any express or implied request by the defendant that the Humane Society care for the dogs, we held that the Humane Society was entitled to restitution from the defendant for their care, noting that the dogs would have been returned to him if he had not been convicted of animal cruelty. *Id.* at 365. In other words, the benefit provided by the Humane Society without request from the defendant was necessary to protect his interests, i.e., in the life of his dogs.

Cynthia makes much of the fact that the *Bayh* case does not mention the defendant needing to make an express or implied request for benefits from a plaintiff in order to support an unjust enrichment claim. We do not believe that this omission indicated our supreme court's rejection of that requirement. There was no question that in *Bayh,* the benefits provided by the plaintiffs-mental hospital patients were provided to the State at the express or implied request of the State, through those who operated the mental hospitals. Thus, there was no need to mention that element in the *Bayh* opinion. The focus of the court's inquiry was whether the mental patients expected to be paid for their work, not whether the work had been impliedly or expressly requested.

We further observe that the latest draft of the Restatement of Law regarding unjust enrichment and/or restitution is entirely consistent with *Biggerstaff* and other cases from this court and embodies a general requirement that a benefit conferred by a plaintiff was requested by the defen-

dant. Specifically, "The fact that a recipient has obtained a benefit without paying for it does not of itself establish that the recipient has been unjustly enriched." Restatement (Third) of Restitution & Unjust Enrichment § 2(1) (Tentative Draft No. 7, 2010). "There is no liability in restitution *for an unrequested benefit voluntarily conferred,* unless the circumstances of the transaction justify the claimant's intervention in the absence of contract." *Id.,* § 2(3) (emphasis added). Additionally, "Liability in restitution may not subject an innocent recipient to a forced exchange: in other words, an obligation to pay for a benefit that the recipient should have been free to refuse." *Id.,* § 2(4).

In considering *Bayh, Biggerstaff,* the Restatement, and the myriad cases from this court defining unjust enrichment, we conclude such a claim requires a plaintiff to prove not only the provision of a measurable benefit to a defendant, but also that the defendant impliedly or expressly requested that benefit. Additionally, the plaintiff must have a reasonable expectation of being paid, or the defendant reasonably must have expected to pay for the benefit. Alternatively, if a plaintiff cannot prove that the defendant expressly or impliedly requested the benefit, then it must be proven that provision of the benefit was necessary to protect the interests of the defendant or another.

■ Here, the jury awarded Cynthia $20,000 on her claim of unjust enrichment. The Colemans argue that this sum solely went toward improvements Cynthia and Jerry allegedly made to the 962 property, while Cynthia contends the jury could have intended this sum to compensate her for the value of the property itself. This is a critical distinction, and we believe an award of $20,000 in damages could only have been intended to compensate Cynthia for the improvements made to the property, not the property as a whole. Specifically, the evidence contains two professional appraisals of the property, one valuing it at $65,000 in August 2007, but declining in value to $40,000 by February 2010, with the value of the land alone being $5000 at both times. Cynthia testified as to her personal opinion that the property was worth $85,000.

Thus, there is no evidence in the record that would have supported a jury awarding anything less than $40,000 if it had intended to compensate Cynthia for the value of the property as a whole. An award of $20,000 for the value of the property as a whole would be outside the scope of the evidence before the jury. *Cf. Skinner v. Skinner,* 644 N.E.2d 141, 144 (Ind.Ct.App. 1994) (stating that scope of evidence regarding value of property was defined by the parties' respective appraisals of the property's value). We are compelled to conclude that the jury awarded damages to Cynthia based solely on its assessment of a list of improvements she and Jerry allegedly made to the property.[7]

With respect to improvements that Cynthia and Jerry made to the property, there is absolutely no evidence that any of the Colemans requested that any such improvements be made, either expressly or impliedly. In fact, it appears there was never any discussion regarding improvements; Cynthia and Jerry simply made them without any advance consultation with the Colemans, while being fully aware that they (Cynthia and Jerry) were not the owners-of-record of the property. Abram, at Jerry's request, did voluntarily agree to have his name placed on the deed for the

---

7. Cynthia's list of alleged improvements substantially exceeded $20,000, but that figure is within the scope of the evidence as far as improvements are concerned. In other words, the jury could have awarded her damages based on some, but not all, of the alleged improvements.

962 property. Whatever the circumstances of how exactly the 962 property itself was paid for, however, and whom it "actually" belonged to, there is no evidence that Abram at any time desired that Cynthia and Jerry expend money to improve the property.

Also, to the extent Abram may have told Cynthia after Jerry died that she could continue living there indefinitely or that the property was hers, there is no evidence that Cynthia made any improvements to the property after that statement was made, in reliance upon it. Indeed, she moved out of the property not long after Jerry's death. Nor is there any evidence that any of the improvements were necessary to protect the Colemans' interests. In other words, the improvements to the property can only be described as having been "officiously" provided, i.e. without request by the Colemans and without being necessary to protect their interests. Therefore, even if the Colemans were enriched by the improvements, there simply is insufficient evidence that they were *unjustly* enriched. We reverse the jury's verdict in favor of Cynthia for unjust enrichment.[8]

## II. Attorney Fees

▮▮▮ Next, we address the Colemans' argument that the jury improperly awarded attorney fees to Cynthia under its unusual verdict in her favor on the theft count. Cynthia sought damages and attorney fees under that count pursuant to Indiana Code Section 34–24–3–1, also known as the Crime Victim's Relief Act, which provides in part that "[i]f a person suffers a pecuniary loss as a result of [certain offenses, including theft], the person may bring a civil action against the person who caused the loss for the following: ... (3) A reasonable attorney's fee." This statute is penal in nature and must be strictly construed. *Harco, Inc. of Indianapolis v. Plainfield Interstate Family Dining Assocs.*, 758 N.E.2d 931, 945 (Ind. Ct.App.2001). A plaintiff must prove by a preponderance of the evidence that the defendant committed a criminal act, although a conviction is not a condition precedent to recovery. *Id.*

This court has plainly held that if a plaintiff suffers no pecuniary loss as the result of a defendant's actions, the plaintiff is not entitled to recover attorney fees under the Crime Victim's Relief Act. *Bridgeforth v. Thornton*, 847 N.E.2d 1015, 1028 (Ind.Ct.App.2006). The statute explicitly refers to "pecuniary loss" as the necessary prerequisite for an award of attorney fees. It does not state that any "victim" of one of the enumerated crimes is entitled to attorney fees. If the legislature had intended the statute to have that broad of an application, it could have worded the statute differently.[9]

Here, although the jury purportedly found in Cynthia's favor on the theft count, it also explicitly found that she suffered no damages as a result of any theft by the

---

8. Our resolution of this claim makes it unnecessary to address the Colemans' argument that Cynthia was a tenant-at-sufferance at the 962 property, and as such Cynthia was not entitled to reimbursement for any improvements to the property in the absence of an express contract to that effect. *See Lafary v. Lafary*, 522 N.E.2d 916, 918–19 (Ind.Ct.App. 1988). Cynthia contends that the Colemans waived that argument by failing to raise it before the trial court and jury. *See Grath-*

*wohl v. Garrity*, 871 N.E.2d 297, 302 (Ind.Ct. App.2007).

9. Cynthia cites several cases for the proposition that a showing of pecuniary loss is not necessary to recover attorney fees under the Crime Victim's Relief Act, including *Baxter v. Lyttle*, 475 N.E.2d 675 (Ind.1985), *McLemore v. McLemore*, 827 N.E.2d 1135 (Ind.Ct.App. 2005), and *Citizens National Bank of Evansville v. Johnson*, 637 N.E.2d 191 (Ind.Ct.App. 1994). None of these cases addressed the

Colemans. It is, of course, doubtful whether the jury actually intended to find that the Colemans had committed theft; their foreperson originally expressly stated to the trial court that they did not believe the Colemans had committed theft. In any event, despite Cynthia's argument to the contrary, a finding of no damages necessarily means that the jury found she suffered no pecuniary loss as a result of any purported theft. We also reject Cynthia's effort to incorporate the jury's award of damages for unjust enrichment into its separate verdict on the theft count. The two claims have very different elements and unjust enrichment, even if we had not reversed that verdict, is not a basis for an award of attorney fees under the Crime Victim's Relief Act. The jury erred in awarding her attorney fees under the theft count. We reverse the award of attorney fees.

### Conclusion

There is insufficient evidence to support the jury's verdict in favor of Cynthia on her claim of unjust enrichment against the Colemans. Additionally, the award of attorney fees was not permitted by the Crime Victim's Relief Act because Cynthia failed to prove that she suffered any pecuniary loss as a result of purported theft by the Colemans. We reverse the trial court's entry of judgment on those verdicts, and remand for entry of judgment in favor of the Colemans on those counts and for further proceedings consistent with this opinion.

Reversed and remanded.

RILEY, J., and DARDEN, J., concur.

question that we squarely answered in the negative in *Bridgeforth*. namely, whether attorney fees may be awarded under the statute if a plaintiff failed to prove any pecuniary loss.